IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| TREVIO HEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 316-039 |
| | ) | |
| FRED GAMMAGE, Deputy Warden | ) | |
| of Security, Telfair State Prison; | ) | |
| WILLIAM DANFORTH, Warden, | ) | |
| Telfair State Prison; ROBERT TOOLE, | ) | |
| Field Operations Officer; STEVE | ) | |
| UPTON, Classification; TERENCE | ) | |
| KILPATRICK; SGT. MIXON; RODNEY | ) | |
| MCCLOUD, Prison Official; and PHILLIP | ) | |
| HALL, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Plaintiff, an inmate at Telfair State Prison ("TSP") in Helena, Georgia, brought this case pursuant to 42 U.S.C. § 1983, proceeding *pro se* and *in forma pauperis*. The Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 81), Plaintiff's motion for leave to amend be **DENIED**, (doc. no. 93), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

## I.  FACTS

### A.  Plaintiff's Evidence of Gang Violence at TSP

The only claim remaining at summary judgment is Plaintiff's deliberate indifference to safety claim against Defendants in their individual capacities, and at the core of this claim is

Plaintiff's allegation TSP is rife with gang violence to such a degree that violence and terror reign. (See doc. no. 85.) Plaintiff has been an inmate at TSP from late 2013 to the present. (Stm. of Material Facts ("SMF"), doc. no. 81-1, Pl.'s Dep., doc. no. 81-3, p. 26.) Plaintiff has never been involved in any gang-related altercations while at TSP. (Id. at 41-42, 96, 144.) Additionally, he has never been physically attacked or injured at any time while at TSP. (Id.) Plaintiff denies being in a gang or classified as a gang member. (Id. at 25-26.)

Plaintiff observed four gang-related fights at TSP beginning in 2015. (Id. at 94-95, 107-08, 119-22.) On December 2, 2015, Plaintiff observed members from two rival gangs, the Bloods and Crips, fight in front of Building A. (Id. at 94.) Plaintiff believes they were members of the Bloods and Crips because of what he heard from another inmate. (Id. at 95.) In December 2015, two inmates, believed by Plaintiff to be gang members, said to each other "let's quash our fights, let's quash our beef," while Defendants Kilpatrick and Mixon escorted them to their cells. (Id. at 73-76.) Defendants Kilpatrick and Mixon did not say anything while escorting the two inmates. (Id.) On December 3, 2015, TSP officers conducted a shakedown of Building C, and they confiscated twenty-three weapons and wrote nineteen disciplinary reports. (Doc. no. 85-2, pp. 19-30.) In January 2016, Plaintiff observed several gang members congregating outside the gym. (Pl.'s Dep., pp. 87-88.) He believed they were gang members because they were standing in a group and not playing basketball. (Id.) Other than standing in a group, the inmates were not doing anything. (Id.)

On March 19, 2016, Warden Hall and Deputy Warden McCloud, along with Captain Sikes and Barbara Grant, addressed all eighty inmates, including Plaintiff, in Building B Dorm 2 about the recent violence in that dorm. (Id. at 57-61.) Either Warden Hall or Deputy Warden

McCloud said "we place you guys in these dormitories" and "we expect you to lead." (Id. at 61.) Also, Deputy Warden McCloud screamed "lead" during the speech. (Id.) The speech was not directed at or referencing any particular gang or gang members. (Id. 62-63.) Plaintiff has not observed or heard any Defendant provide gang members with instructions or authority regarding prison security. (Id. at 90-91.)

At some point between July and December 2016, Plaintiff, while in Building B Dorm 2, observed a Blood gang member stab a Mexican gang member in Building C. (Id. at 104-08.) Plaintiff could not identify the inmates involved in the altercation. (Id. at 107.) He believed they were gang members because one was a "Mexican man" and the Blood gang member made a "war call." (Id. at 107-108.)

On June 8, 2016, between 5:40 p.m. and 6:00 p.m., a TSP correctional officer allowed members of the "Aron Brotherhood" gang to meet and assault another prisoner outside the gym at TSP. (Doc. no. 13, p. 3.) On June 10, 2016, CERT officers allowed "Gangster Disciples" to gather during yard time. (Id.) On either June 18 or June 19, 2016, Aron Brotherhood and Gangster Disciples members "tattooed a penis on [another inmate's] back that stated I am a child molester," and they forced another inmate to pack his stuff and leave the dorm. (Id.) On June 20, 2016, unknown gang members stabbed unknown individuals in Buildings D and G. (Id.) The prison was placed on lockdown as a result of these incidents. (Doc. no. 16, p. 3.)

On July 12, 2016, TSP officials conducted a shakedown and confiscated fifty-five weapons, six cell phones, five cell phone chargers, 6.9 grams of marijuana, one external hard drive, four gallons of homemade alcohol, twelve green dot cards, two cellular phone batteries, five tattoo guns, and nine water heaters. (Doc. no. 85-2, pp. 19-20; doc. no. 16, pp. 1-2.) On

July 25, 2016, gang members were involved in three more stabbings. (Doc. no. 16, p. 2.) On November 24, 2016, unknown Blood and Crip gang members assaulted each other. (Doc. no. 40, p. 5.) On December 2, 2016, unknown Blood gang members cut S-Rock, a former Blood gang member, in the face for being a snitch. (Id.)

On December 8, 2016, Plaintiff signed a statement requesting protective custody and handed it to Lieutenant Clark on second shift between 2:08 a.m. and 2:30 a.m. (Id. at 7.) The next day, unknown Blood gang members threatened Plaintiff by letter as follows:

> We told you one time about getting in the mix of things. The Admin. gave us everything to utalize [sic] the prison. We even tried to give you a piece. Do you think you can just deny what we tried to give you and you can still walk around prisons. Blood Gang will take care of you. We know exactly where you are bitchass nigga. And you can't run. We gonna [sic] have some real 'fun' wit [sic] you. You come out the box. Do the right thing and keep that mouth shut. Ride for the prison or die in the prison and we have the resource that you know about. We gone get ya [sic] like the other snitch ass nigga don't feel me, feel that razor. Ha [sic]. Bitch.

(Id. at 9.)

In November 2017, when housed in Building A Dorm 2, Plaintiff observed a Blood gang member stabbing another Blood gang member. (Pl.'s Dep., p. 119.) At some point in 2017, Blood gang members attacked a group of homosexuals in the Prison Rape Elimination Act ("PREA") dorm. (Id. at 121-23.) Plaintiff does not know if anyone in the PREA dorm was a gang member. (Id.) In December 2017, unknown individuals stabbed and killed a member of the "Ghostface" gang. (Id. at 124-25.)

In January 2018, Plaintiff was threatened by a member of the "Gangster Disciples" to drop his lawsuit because the gang was everywhere including on the streets. (Id. at 51-53.) Plaintiff interpreted this to include a threat against his family and himself. (Id.) Plaintiff did not

4

know the individual who threatened him.  (Id.)  Plaintiff reported this incident and requested protective custody from Ricky Wilcox.  (Id.)  Plaintiff did not report this incident to any Defendant.  (Id.)

By declaration, Travion Hall states Mexican gang members assaulted him from November 2017, to December 22, 2017.  (Travion Decl., doc. no. 67-2, pp. 1-3.)  Antonio Harris, Jr. declared Deputy Warden McCloud and Warden Hall authorized him to bring order in the PREA dorm as he pleased.  (Harris Decl., doc. no. 68-2, p. 1.)  When Deputy Warden McCloud and Warden Hall told Mr. Harris they wanted to keep the number of Blood and Mexican gang members balanced, Mr. Harris placed two people on the dorm doors and two unknown persons were stabbed.  (Id. at 1-2.)  Additionally, non-gang members were forced to pay dues for gangs to make weapons.  (Id.)  Mr. Harris later decided to no longer be a part of what he believed Deputy Warden McCloud and Warden Hall were doing and told them he would be "dropping the flag."  (Id. at 2.)  Defendants McCloud and Warden Hall told him good luck.  (Id.)  On November 27, 2017, Mr. Harris was stabbed multiple times by three masked men.  (Id. at 2-3.)

Elvis Jewell declared he has personally seen, in the PREA dorm, Warden Hall encouraging gang and group leaders to "handle matters and problems, as they see fit, amongst themselves . . . ."  (Jewell Decl., doc. no. 67-1, p. 1.)  Mr. Jewell asserts Warden Hall's encouragement of gangs occurred after the gangs were the direct cause of violence.  (Id.)  He does not state any dates or specific incidents of violence.  Further, Mr. Jewell asserts non-gang members, like himself, are "extorted" for their use of televisions, video time, and tablets.  (Id. at 2.)  When Mr. Jewell approached Warden Hall about these problems, Warden Hall stated he

would order more gang members of another gang to ensure gang populations were equal. (<u>Id.</u>) Mr. Jewell does not allege to have been injured himself in any attack, but he is fearful he may be next. (<u>Id.</u> at 3.)

### B. Undisputed TSP Practices

#### 1. Inmate Housing and Classification Practices

Upon entering the Georgia Department of Corrections ("GDC") system, all inmates are housed at the same facility to be evaluated and classified by security risk, individual characteristics, and medical treatment needs. (SMF, Hall Decl., doc. no. 81-4, ¶ 5.) The purpose is to ensure GDC assigns inmates to the most appropriate prison within the GDC system. (<u>Id.</u>) GDC determines each inmate's security level of either minimum, medium, or close, taking into account criminal sentence, nature of conviction, criminal history, and any gang affiliation. (<u>Id.</u> at ¶ 6.) Close security inmates must be housed at close security prisons and exhibit one or more of the following characteristics: (1) violent crimes; (2) assaultive histories; (3) escape risk; (4) dangerousness; and (5) detainers for other serious crimes. (<u>Id.</u> at ¶ 7.) Close security inmates require heightened security and supervision, restricted movement, and may not leave the prison grounds. (<u>Id.</u>) Plaintiff is classified as a close security inmate, and TSP is a close security prison. (<u>Id.</u> at ¶¶ 9, 10; Pl.'s Dep., p. 37.)

TSP houses approximately 1,400 inmates, which is average in the GDC system, where close security prisons house between 1,100 to 1,800 inmates. (Hall Decl., ¶ 11.) TSP houses its inmates in one of eight buildings labeled A to H. (<u>Id.</u> at ¶ 12.) Buildings A to D are general population buildings containing two dorms within each building, eighty inmates per dorm, and individual cells within each dorm. (<u>Id.</u>) These buildings allow free movement within the dorm

during the day, but inmates are locked in their cells at night. (Id.) At all times, inmates are restricted from moving to another dorm in the same building or another building by walls, fences, and physical barriers. (Id.) Correctional officers are posted to oversee each dorm. (Id.) During yard call or chow time, each dorm travels together accompanied by correctional officers, and must go through metal detector checkpoints. (Id.)

Buildings E and F are known as tier or segregation dorms whereby inmates are placed in two or one-person cells and must be accompanied by a correctional officer every time they leave their cell. (Id. at ¶ 13.) The dorms of these buildings can house up to 280 inmates. (Id.) Inmates are placed in these buildings for either short or long periods of time because they committed disciplinary infractions, have violent histories, or are in protective custody. (Id.)

Gangs, also referred to as "security threat groups" ("STG"), exist in every prison, but particularly so in close security prisons because gang membership increases the security level of an inmate. (Id. at ¶ 15.) Almost all STG inmates are classified as medium or close security. (Id. at ¶ 17.) Gang membership is impossible to prevent because it is personal, voluntary, and not publicly visible. (Id. at ¶ 15.) In addition to initial screening at the entry facility, TSP has an STG coordinator, usually a corrections officer, who is responsible for gathering information and screening inmates upon their entry into TSP by interviews and observations. (Id. at ¶ 18.) Through this process, inmates become validated STG members. (Id.) TSP continues to gather new information to determine changes in inmate affiliations, but given the subjective, non-public nature of gang affiliation, it is impossible to identify accurately all gang members at TSP. (Id.)

Known gang members are housed with non-gang members to ensure there is not a high concentration of any one gang, or gang members generally, in any one dorm because high

concentrations of one gang or gang members increase the likelihood for violent altercations. (Id. at ¶¶ 19-21.) The majority of gang violence occurs because of animosity between rival gang members. (Id. at ¶ 21.) TSP spreads validated STG inmates from different gangs among the buildings and dorms to reduce the likelihood of violence. (Id. at ¶ 22.)

### 2. Security Measures at TSP

Inmate-on-inmate violence is prevalent in all prisons and is even more prevalent in close security prisons because they house the most violent offenders. (Id. at ¶ 24.) In addition to using metal detectors during mass movements of dorms, keeping informed of STG-related activity, and housing gang members strategically, TSP prison officials conduct meetings to discuss security issues, incidents of violence, and weapons and contraband discoveries. (Id. at ¶¶ 26-28.) It is common practice for TSP officials to write incident and disciplinary reports when there are inmate assaults. (Id. at ¶ 29.) When gang-related activity and violence is observed, TSP officials make speeches informing inmates individually and dorm-wide that gang-related activity will not be tolerated. (Id.) To control the amount of contraband at TSP, officers perform shakedowns, or unannounced searches of inmates and their living spaces, to discover and confiscate weapons and other contraband. (Id. at ¶ 30.) Shakedowns occur at least once a month and possibly two to three times a week. (Id.) Additionally, inmates are searched based on tips or suspicion of contraband, and a specifically designated group of TSP officers, Correctional Emergency Response Team ("CERT"), gathers intelligence and searches for contraband. (Id.)

Warden Philip Hall removed all desks in inmates' dorms to prevent inmates from making weapons out of them. (Pl.'s Dep., pp. 30-31.) Warden Hall and Deputy Warden McCloud ordered the fence around the prison painted orange to discourage inmates from breaking off

pieces to use as weapons. (Id. at 134-35.) Also, TSP officials implement lockdowns to diffuse and address incidents of violence involving multiple inmates. (Hall Dec., ¶ 33.) Warden Hall increased the amount of yard time to allow inmates to exercise and decrease the symptoms of physical aggression. (Id. at ¶ 35.) TSP hired a recreational director and two coaches to assist in increasing the effectiveness of yard time. (Id.)

In the event an inmate complains of a specific threat from an identifiable source, TSP officials will attempt to mitigate the threat or offer the inmate protective custody. (Id. at ¶ 36.) However, an inmate merely stating he feels unsafe with gang members is insufficient to warrant a housing change because gang members are present in all dorms. (Id. at ¶ 37.) Defendants are unaware of Plaintiff ever making a request for protective custody. (Id. at ¶ 38.)

### C. Defendants' Occupations

At all times relevant to this case, Defendant Steve Upton was Director of Field Operations for GDC. (SMF, Upton Decl., doc. no. 81-8, ¶ 2.) He neither controls nor is aware of the daily operations, management, or security at TSP or any other GDC facility. (Id. at ¶ 3.) He does not control the general movement or classification of inmates, including security levels or STG designations. (Id.) He has never met Plaintiff, and Plaintiff sued him because Plaintiff saw his name on outdated prison information. (Id. at ¶ 7; Pl.'s Dep., pp. 72-73.)

Defendant Robert Toole is GDC's Deputy Director of Facilities and had held that title since January 1, 2018. (SMF, Toole Decl., doc. no. 81-9, ¶ 2.) Like Mr. Upton, most of his work is performed at GDC's headquarters and does not involve daily management of institutional-level security, housing, or classification. (Id. at ¶ 3.) Prior to January 1, 2018, he was a regional director at GDC. (Pl.'s Dep., p. 66.) During a visit to TSP in July 2016,

9

following a lockdown, he delivered a speech to the inmates advising them gang activity would "no longer be tolerated." (Id.)

Defendant Terence Kilpatrick is currently Warden of Smith State Prison in Glennville, Georgia. (SMF, Kilpatrick Decl., doc. no. 81-11, ¶ 2.) As Tier Unit Manager at TSP from February 2015 until February 2016, he oversaw administration of TSP's tier housing units. (Id. at ¶¶ 3-5.) He did not have the ability to control or modify the housing of any inmates who were not being housed in tier segregation. (Id.) Further, he did not have the ability to control the overall housing scheme at TSP. (Id. at ¶ 5.)

Zachary Mixon is currently a Sergeant at Treutlen Probation Detention Center in Soperton, Georgia, and has held that position since June 2016. (SMF, Mixon Decl., doc. no. 81-10, ¶ 2.) He was a correctional officer at TSP with the title of Sergeant from March 2014 until June 2016. (Id.) Sgt. Mixon did not have the ability to control or modify an inmate's housing or security classification. (Id. at ¶¶ 4-5.) Nor did he have the ability to modify the overall housing scheme at TSP. (Id.) Plaintiff testified he sued Defendants Kilpatrick and Mixon merely because they escorted two inmates believed by Plaintiff to be gang members on December 3, 2015. (Pl.'s Dep., pp. 73-76.)

Defendant William Danforth is Assistant Regional Director for the Southwest GDC Region based in Leesburg, Georgia, and has held that title since January 1, 2016. (SMF, Danforth Decl., doc. no. 81-5, ¶ 2.) TSP is not one of the nine prisons included in GDC's Southwest Region, and he has no knowledge or oversight of its daily operations. (Id.) From 2012 until January 2016, Defendant Danforth served as Warden at TSP. (Id. at ¶ 3.) Plaintiff

has never personally observed or heard Defendant Danforth giving gang leaders authority to run dorms. (Pl.'s Dep., pp. 65-66.)

Defendant Phillip Hall has served as Warden of TSP from January 1, 2016, to present. (Hall Decl., ¶ 2.) Plaintiff had one conversation with Warden Hall in 2016, when Plaintiff asked Warden Hall to create a "civilian-only" dorm for him. (Pl.'s Dep., p. 56.) Warden Hall explained he would not because it would increase security risks in dorms where there would be only gang members. (Id at 56-57.) Further, he explained it is impractical to eliminate all gang presence in a dorm given the subjective nature of gang affiliation. (Id.; see also Hall Decl., ¶ 39.) Plaintiff did not speak to Warden Hall about his living situation again because he believed it was "pointless" to do so. (Pl.'s Dep., pp. 57-58.) Plaintiff has never personally observed or heard Warden Hall provide gang members with instructions or authority regarding prison security. (Id. at 93.)

Rodney McCloud is Deputy Warden of Security at TSP and has held that title since January 25, 2016. (SMF, McCloud Decl., doc. no. 81-7, ¶ 2.) Plaintiff sued him because he was present for the March 2016 speech to Building B Dorm 2. (Pl.'s Dep., pp. 58, 64.) Plaintiff never personally observed or heard Deputy Warden McCloud provide gang members with instructions or authority regarding prison security. (Id. at 93.) Plaintiff has not articulated any specific threats to his safety to Deputy Warden McCloud. (Id. at 69-71.)

Defendant Fred Gammage is Deputy Warden of Security at Autry State Prison ("ASP") in Pelham, Georgia, and has held that title since June 2017. (SMF, Gammage Decl., doc. no. 81-6, ¶ 2.) He was Deputy Warden of Security at TSP from January 2015 until June 2017. (Id.) Plaintiff has never personally observed or heard Deputy Warden Gammage provide gang

members with instructions or authority regarding prison security.  (Pl.'s Dep., pp. 66, 93.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross,

663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59). A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**B.    Factual Record**

In response to Defendants' motion for summary judgment, Plaintiff does not specifically contradict Defendants' factual assertions but instead references fifteen declarations signed by him consisting of legal argument, policy guidelines, and allegations of violent altercations at TSP. (See generally doc. nos. 10, 13, 16-18, 20, 39-40, 43, 44, 67-69, 71, 92.) Plaintiff also submitted declarations by inmates Ricky Lewis Wilson, Chavez Woodbury, Isaiah Blackmon, Alan Maxwell Dyer, Elvis Jewell, Travion Hall, and Antonio Harris, Jr. (Doc. nos. 4, 42, 44, 51, 67-1, 67-2, 68-2.)

Because Plaintiff did not provide a statement of material facts directly refuting Defendants' statement of material facts, the Court deems admitted all portions of Defendants' Statement of Material Facts having evidentiary support in, and not otherwise contradicted by, the record. See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (finding no error in deeming defendants' material facts admitted where pro se prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).

However, Defendants, as the movants, continue to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Thus, the Court will consider facts in the record outside of Defendants' statement of material facts, including Plaintiff's deposition and the declarations filed by Plaintiff, to the extent they meet the requirements of Federal Rule of Civil Procedure 56, "to determine if there is, indeed, no genuine issue of material fact." Mann, 588 F.3d at 1303.

### C. Defendants Are Entitled to Summary Judgment Because TSP Is Not Exceedingly Violent and Plaintiff Has Never Been a Victim of Gang Violence

Defendants contend they are entitled to summary judgment because: (1) Plaintiff was not subject to an objectively substantial risk of serious harm; (2) Defendants did not act with deliberate indifference to any substantial risk of serious harm; (3) Plaintiff fails to prove causation; (4) Plaintiff's claims for injunctive relief are moot to some Defendants and sweeping and intrusive to the other Defendants; and (5) Defendants are protected by qualified immunity. (See doc. no. 81-2.) Plaintiff contends Defendants are allowing gang leaders to control inmate security at TSP, are deliberately indifferent to rising gang violence, and have created "generalized conditions of dangerousness." (See doc. no. 85.) The Court concludes summary judgment is proper because no reasonable juror could find: (1) the environment at TSP is exceedingly violent and violative of the Eighth Amendment; or (2) Plaintiff has ever been a victim of gang violence or the alleged policy of ceding disciplinary authority to gang leaders. The Court need not address Defendants' arguments regarding

qualified immunity. Plaintiff's request for injunctive relief fails because his substantive claim fails.

## 1. Legal Standard for Deliberate Indifference to Safety Claim

A prisoner has a constitutional right to be protected from violence and physical assault by other inmates. Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984) (*per curiam*). However, because "a risk of harm to some degree always exists by the nature of it[] being a [prison]," not every condition rises to the level of an Eighth Amendment violation. Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga., 400 F.3d 1313, 1323 (11th Cir. 2005); see also Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981) ("This does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials."); Terry v. Bailey, 376 F. App'x 894, 895 (11th Cir. 2010) (*per curiam*) ("Although 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners,' not every instance of inmate on inmate violence 'translates into constitutional liability for prison officials responsible for the victim's safety.'"). "An excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014).

"Merely negligent failure to protect an inmate from attack does not justify liability under § 1983." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (*per curiam*) (citation omitted). Stated otherwise, Eighth Amendment liability cannot be based on simple

negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk.  Farmer, 511 U.S. at 835-39; see also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (requiring plaintiff to show "more than mere negligence," and stating courts are to look for "obduracy and wantonness, not inadvertence or error in good faith.").

In particular, a prisoner seeking to impose liability for an Eighth Amendment claim must establish the existence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal quotations omitted).  These three elements are evaluated in part by an objective standard and in part by a subjective standard.  See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

As the Eleventh Circuit explained,

When examining the first element—a substantial risk of serious harm—the court uses an objective standard.  The second element—the defendant's deliberate indifference to that risk—has two components:  one subjective and one objective.  To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm.  To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted).  The deliberate indifference prong of the test requires proof of "(1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence."  Dang ex rel. Dang v. Sheriff, Seminole Cty., Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).  In addition, "[a] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Lane</u>, 835 F.3d at 1308 (quoting <u>Farmer</u>, 511 U.S. at 837)). Defendants are entitled to summary judgment because Plaintiff cannot establish the three prima facie elements for an Eighth Amendment claim.

### 2. No Reasonable Juror Could Find a Substantial Risk of Serious Harm Because Violence and Terror Do Not Reign at TSP

Applying an objective standard to the first prong of Plaintiff's deliberate indifference claim, no reasonable juror could find a substantial risk of serious harm. "On substantial risk of serious harm, 'this objective standard embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . , but must be balanced against competing penological goals.'" <u>Purcell ex rel. Estate of Morgan</u>, 400 F.3d at 1321 (quoting <u>LaMarca v. Turner</u>, 995 F.2d 1526, 1535 (11th Cir. 1993)). A prisoner has a right "to be reasonably protected from constant threat of violence". <u>Id.</u> (quoting <u>Woodhous v. Virginia</u>, 487 F.2d 889, 890 (4th Cir. 1973). However, a "prison custodian is not the guarantor of a prisoner's safety." <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1564 (11th Cir. 1990).

The core of Plaintiff's case is his allegation that TSP is rife with gang violence to the extent terror and violence reign. (Doc. no. 85, p. 1.) Even when viewed in the light most favorable to Plaintiff, the record shows gang violence was not constant at TSP, and non-gang members, like Plaintiff, were not under a constant threat of harm.

From 2015 to his deposition on February 19, 2018, Plaintiff has personally observed only four violent gang altercations at TSP. (Pl.'s Dep., pp. 94-95, 107-08, 119-22.) Even taking as true all of the violent altercations mentioned in the twenty-two declarations filed by

Plaintiff, only approximately twenty-five incidents have occurred in three years in a prison with 1,400 inmates. (See doc. nos. 4, 10, 13, 16-18, 20, 39-40, 42-44, 51, 67-69, 71, 92 (alleging attacks at TSP); Hall Decl., ¶ 11 (estimating of number of inmates at TSP).) Additionally, of all the incidents alleged by Plaintiff, the only mention of gang members preying on non-gang members is the attack in the PREA dorms, (Pl.'s Dep., pp. 121-23; Harris Decl.; Jewell Decl.), the attack on Travion Hall by the Mexican gang, (Travion Decl.), and the threat made against Plaintiff to drop this lawsuit, (id. at 51-52). This level of violence is hardly sufficient to be considered a constant threat.

Plaintiff also argues Defendants gave authority to gang leaders to control security and, by doing so, created a constant threat of gang violence. (Doc. no. 85, p. 2.) However, Plaintiff has never himself heard any Defendant expressly giving gang leaders authority over prison security. (Pl.'s Dep., pp. 66, 93.) The only evidence Plaintiff cites is his observation of Defendants Mixon and Kilpatrick escorting two feuding gang members back to their cells, (id. at 73-75), the March 9, 2016 speech by Deputy Warden McCloud and Warden Hall to Building B Dorm 2 about "leading," (id. at 58-60), and Antonio Harris, Jr., and Elvis Jewell's declarations concerning the PREA dorm, (Harris Decl.; Jewell Decl.).

Defendants McCloud, Kilpatrick, Mixon, and Hall each deny promoting gang violence or ever giving gang leaders authority to control inmates. (Hall Decl., ¶¶ 40-42; McCloud Decl., ¶¶ 32-34; Kilpatrick Decl., ¶¶ 8-10; Mixon Decl., ¶¶ 8-10.) The incident involving Defendants Kilpatrick and Mixon and the March 9th speech fail to suggest otherwise. Plaintiff admits Defendants Kilpatrick and Mixon never said anything to the inmates they were escorting, and the two inmates, as gang members of rival gangs, decided

to end their hostility on their own accord.  (Pl.'s Dep., pp. 74-76.)  Plaintiff also admits the March 9th speech was not directed to any one gang or gang members generally, and at most encouraged inmates to be leaders in the effort to decrease gang violence.  (Id. at 62-63 ("[T]hey say it was a general statement.  They never clarified how they was saying it."))

The declarations by Messrs. Jewell and Harris do not create a genuine issue of material fact because, at most, they allege prison officials authorized gang members to discipline inmates inside the PREA dorm only.  Plaintiff did not reside in the PREA dorm, according to Plaintiff's own testimony.  (Id. at 182.)

Further, as detailed in § I.B, supra, the undisputed housing and security measures implemented by GDC and TSP negate Plaintiff's contention Defendants have created "generalized conditions of dangerousness" at TSP.  GDC carefully screens all inmates and places them in the appropriate prison to achieve the lowest likelihood of violence.  (Hall Decl., ¶¶ 17-18.)  Also, as a close security prison, TSP must house violent inmates with gang affiliations, and TSP distributes gang members across the prison population to decrease the risk of gang violence.  (Id. at ¶¶ 7, 10.)

At TSP, inmates must pass through metal detectors during chow and yard time, inmates' cells are searched for contraband in shakedowns, furniture capable of being made into weapons has been removed from inmate cells, and procedures to punish violent inmates are in place.  (Id. at ¶¶ 12, 30-33; Pl.'s Dep., pp. 59, 65-66, 78-81, 134-35.)  If a widespread altercation does occur, prison officials have authority to place individual dorms in lockdown to diffuse the situation.  (Hall Dec., ¶ 33.)  Plaintiff admits TSP was in lockdown after gang violence broke out in June 2016.  (Doc. no. 16, p. 3.)

Most importantly, the fact Plaintiff has never been injured or involved in any gang-related altercation while at TSP shows violence does not reign and TSP's security measures are effective in creating an objectively safe environment both generally and with respect to Plaintiff. (See Pl.'s Dep., pp. 94-95, 107-08, 119-22.)   At most, Plaintiff has proved he is fearful of an attack, but fear does not by itself constitute imminent danger.  See Baze v. Rees, 553 U.S. 35, 50 (2008) (quoting Helling v. McKinney, 509 U.S. 25, 33, 34–35 (1993)) (stating for Eighth amendment claims, "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers'").  By their nature, all prisons have some degree of risk.  (Hall Decl., ¶¶ 15, 24-25); see Purcell ex rel. Estate of Morgan, 400 F.3d at 1323 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991) (describing inherent risk in jail setting).   Because no reasonable juror could find unreasonably dangerous risk levels at TSP, either generally or with respect to Plaintiff, there is no objectively substantial risk of serious harm at TSP.

Close examination of controlling precedent leaves no doubt of this conclusion.   In Purcell, the plaintiff alleged jail conditions caused her son's beating and subsequent death while detained.  400 F.3d at 1316.  The Eleventh Circuit affirmed summary judgment for the defense because:  (1) prison officials segregated inmates based on crimes committed and potential for conflict with other inmates; (2) prison officials punished inmates for violence; and (3) serious inmate-on-inmate violence was not even close to something of the norm.  Id. at 1321-23.  In Harrison, the Eleventh Circuit held thirty-three attacks over three years in a prison housing between 830-990 inmates was "hardly sufficient to demonstrate . . . a prison 'where violence and terror reign.'"  746 F.3d at 1299-1300 (quoting Purcell ex rel. Estate of

Morgan, 400 F.3d at 1320). Here, TSP has adopted safety protocols similar to those in Purcell, and TSP houses more inmates than in Harrison, but had less violence over the roughly the same period of time, undoubtedly because of the rigorous safety measures by GDC and TSP.

Conversely, in cases where an objectively substantial risk of serious harm existed, there were numerous hazardous conditions, none of which are present here. In Marsh v. Butler County, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), *abrogated on other grounds by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007), conditions creating a risk of serious injury included no segregation of different types of inmates, overcrowding, faulty cell locks allowing freedom of movement for inmates, no lockdowns of prisoners at any point in the day, no inmate screening, no disciplinary procedure, and no visual inspection of cells. Also, in Hale v. Tallapoosa Cty., 50 F.3d 1579, 1581-84 (11th Cir. 1995), a prisoner plaintiff's claims survived summary judgment because the prison did not segregate inmates by proclivity for violence, only one jailer was on duty at certain times in the day, prisoners' cells could not be seen or heard from the guards' quarters, and fights resulting in injuries requiring medical attention were constant. Id.

Further, Marsh and Hale both concerned a prisoner who was physically beaten and injured as a result of the violent conditions. See Marsh, 268 F.3d at 1029 (alleging assault by four inmates resulting in lacerations and broken bones); Hale, 50 F.3d at 1581 (alleging prisoner beaten by two inmates without provocation). Here, Plaintiff has never even been in an altercation at TSP, let alone injured. (Pl.'s Dep., pp. 41-42, 96, 144.)

### 3. No Reasonable Juror Could Find Defendants were Deliberately Indifferent to Any Substantial Risk of Serious Harm

As to the second prong, the undisputed facts show Defendants neither subjectively knew Plaintiff faced a substantial risk of serious harm, nor disregarded that known risk by failing to respond to it in an objectively reasonable manner. See Lane, 835 F.3d at 1307; Caldwell, 748 F.3d at 1099. First, there is no evidence Defendants were actually aware Plaintiff faced a substantial risk of serious harm related to gang violence while at TSP. Defendants deny knowledge of gang violence being a constant threat and gang leaders being given authority over prison security. (Hall Decl., ¶¶ 42-44; Danforth Decl., ¶¶ 26, 35-38; Gammage Decl., ¶¶ 27, 29; McCloud., ¶¶ 32, 34; Upton Decl., ¶ 8; Mixon Decl., ¶ 9; Kilpatrick Decl., ¶¶ 11, 13.) Plaintiff also admits never talking to any of the Defendants about specific threats to his person. (Pl.'s Dep., pp. 56-57, 66, 68-72, 76-79, 154-55.)

Although "[i]nferences from circumstantial evidence . . . can be used to show that a prison official possessed the necessary knowledge," Lane, 835 F.3d at 1308, there is no circumstantial evidence in this case with which to draw such an inference. All prisons have inmate violence and as well as gangs. (Toole Decl., ¶ 14; Hall Decl., ¶¶ 15, 24-25.) However, violence at TSP was not occurring at an excessive or unreasonable rate. (Hall Dec., ¶ 43; Kilpatrick Decl., ¶ 13.) Additionally, every Defendant denies knowledge of, or participation in, ceding authority of prison security to gang leaders because it would be counterproductive to prison safety. (Hall Decl., ¶¶ 42-44; Danforth Decl., ¶¶ 26, 35-38; Gammage Decl., ¶¶ 27, 29; McCloud., ¶¶ 32, 34; Upton Decl., ¶ 8; Mixon Decl., ¶ 9; Kilpatrick Decl., ¶¶ 11, 13.) The only evidence Plaintiff cites to the contrary is woefully inadequate to create a genuine issue of material fact, as explained above. See supra § III.B.2.

Looking to each Defendant individually, Director Upton never worked at TSP or had any involvement with its daily activities, let alone had subjective knowledge of any risk to Plaintiff. (Upton Decl., ¶¶ 3-4, 7.) Deputy Director Toole did not work at TSP and only visited TSP once during the events involved in this case. (Pl.'s Dep., p. 66.) On that visit in June 2016, he gave a speech to one of the dormitories soon after a lockdown acknowledging and admonishing recent gang violence. (Id. at 67.) Plaintiff only sued him because of this speech. (Id.) As to Defendants Danforth and Gammage, Plaintiff admits he never had conversations with Defendants Gammage or Danforth about the problems he perceived with gangs at the prison. (Id. at 72.)

Lastly, Plaintiff admits he did not communicate with Defendants McCloud, Mixon, Kilpatrick, and Hall about any substantial risk of serious harm to him personally from gang violence. (Id. at 56-57, 68-71, 76-79, 154-55.) Plaintiff only sued Defendants Mixon and Kilpatrick because they escorted two gang members to their cells. (Id. at 74-76.) Plaintiff has spoken to both Deputy Warden McCloud and Warden Hall; however, Plaintiff admits these conversations only concerned Plaintiff's generalized fear of gang activity and questions over his living situation. (Id. at 56-57, 68-70). As stated above, generalized awareness of risks is not enough, and Plaintiff never communicated any specific threats to Defendants because he believed it would be pointless to do so. See Carter v. Galloway, 352 F.3d 1346, 1350 (11th Cir. 2003) (finding no subjective awareness of risk where prison officials only possessed general awareness of plaintiff's attacker being problematic inmate); (Pl.'s Dep., pp. 56-57, 66, 68-72, 76-79, 154-55; Hall Decl., ¶¶ 42-44; McCloud., ¶¶ 32, 34; Mixon Decl., ¶ 9; Kilpatrick Decl., ¶¶ 11, 13.)

Second, Plaintiff cannot establish Defendants disregarded a known risk in an objectively unreasonable manner. Plaintiff discusses at multiple times in his depositions, as well as in his filings, the security measures taken when violence occurred. (<u>See</u> Pl.'s Dep., pp. 59, 65-66, 77, 92, 95; doc. no. 13.) From late 2015 to the present, TSP implemented lockdowns when necessary, gave speeches admonishing gang violence, and removed objects capable of being made into weapons. (Pl.'s Dep., pp. 59, 65-66, 77, 92, 95.) TSP has many security measures ranging from security checkpoints with metal detectors, segregated buildings and dorms, and disciplinary procedures for unruly inmates. (Hall Decl., ¶¶ 6-14.)

### 4. Plaintiff Fails to Prove Causation Because He Has Never Been Injured By or Even Involved in Gang Violence

As to the third prong of an Eighth Amendment claim, the record shows Plaintiff cannot establish causation because Plaintiff has never been the victim of prison violence at TSP. <u>See</u> <u>Melton v. Abston</u>, 841 F.3d 1207, 1220 (11th Cir. 2016) (requiring causal connection between Plaintiff's harm and defendant's deliberate indifference). Plaintiff admits he has never been injured, or even involved, in a gang altercation at TSP. (Pl.'s Dep., pp. 42, 96, 144.) In four years, he claims to have only personally observed four altercations he believed to be gang related. (<u>Id.</u> at 94-95, 107-08, 119-22.) Plaintiff has only been able to establish he is fearful of a possible attack or extortion from gang members at TSP. (<u>Id.</u> at 44-45.) This is not enough. <u>See</u> <u>Baze v. Rees</u>, 553 U.S. at 50 (requiring sufficiently imminent danger). In sum, no reasonable juror could find in favor of Plaintiff with respect to any of the three elements of his Eighth Amendment failure to protect claim.

**5.** **Four of the Declarations Filed by Plaintiff Are Fatally Deficient and, Even if Considered, Do Not Change the Outcome**

Plaintiff filed four declarations by Ricky Lewis Wilson, Chavez Woodbury, Isaiah Blackmon, and Alan Maxwell Dyer. (Doc. nos. 4, 42, 44, 51.) The sworn declaration of Ricky Wilson is entirely unhelpful because it merely lists a series of dates he allegedly witnessed unspecified "claims" of "assaults by gang members." (Wilson Decl., doc. no. 4.) Alan Maxwell Dyer's declaration merely repeats information Rodney McCloud allegedly told him on March 9, 2016, as follows:

> It was stated that elected officials from within each gang/organization will be the ones held responsible for any occurrences and should therefore handle any dispute between each other, which allows a power of sorts into the hands of the said elected officials.

(Dyer Decl., doc. no. 51.) The statement is rank hearsay for which Mr. McCloud does not profess any independent, personal knowledge. Nor is his declaration sworn.

Mr. Woodberry alleges Defendants McCloud and Hall delegate disciplinary authority to inmates they appoint as "heads" of the dormitories, and the discipline administered by dormitory heads includes beatings and stabbings. (Woodberry Decl., doc. no. 42.) Mr. Woodberry declares he was a dormitory head but grew disillusioned after a couple of weeks and withdrew, only to be attacked shortly after his withdrawal. (Id.) The declaration is sworn and admissible, but it does not change the outcome because it is undisputed Plaintiff was never assaulted or injured as a result of this alleged program. There is no evidence any such dormitory head threatened Plaintiff, ordered him to be disciplined, or actually disciplined him. Nor does the declaration provide any details concerning the program's length or the number and frequency of related inmate beatings and stabbings.

Finally, Mr. Blackmon's declaration is confusing but appears to allege an effort by Deputy Warden Gammage to trump up disciplinary charges against Mr. Blackmon and force Mr. Blackmon to assault Plaintiff, in an effort to convince Plaintiff he should dismiss this lawsuit. (Blackmon Decl., doc. no. 44.) These allegations have no materiality to the summary judgment motions.

## III. PLAINTIFF'S IMPROPER SUPPLEMENTAL COMPLAINT

On January 23, 2019, Plaintiff filed a "Supplement[al] Complaint" alleging new facts about an attack occurring at the end of April 2018 to late May 2018 at Jackson State Prison in Jackson, Georgia. (Doc. no. 93, p. 2.) He alleges four unknown CERT team officers attacked him and he suffered a shoulder injury. (Id.) He further alleges Defendants were involved in his attack in some form, reasserts his original claims, and alleges multiple disciplinary sanctions were improperly brought against him in 2018. (Id. at 1-3.) Plaintiff also requests reinstatement of his claims for money damages and injunctive relief, and he wrote an accompanying declaration asserting the same facts as his supplemental complaint. Because Plaintiff states the document is a supplemental complaint, alleges new facts, and requests new damages, along with a reinstatement of damages, the Court construes his filing as a motion for leave to amend his complaint.

Federal Rule of Civil Procedure 15, which governs amendment of pleadings, provides as follows:

> A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

26

If a party is not entitled to amend as a matter right under Rule 15(a)(1), then "a party may amend its pleading only with . . . the court's leave." Fed. R. Civ. P. 15(a)(2). As a general rule, leave to amend under Fed. R. Civ. P. 15(a) is given freely. Saewitz v. Lexington Ins. Co., 133 F. App'x 695, 699 (11th Cir. 2005) (*per curiam*); Foman v. Davis, 371 U.S. 178, 182 (1962). That said, leave to amend is not guaranteed, and a trial court may deny such leave "in the exercise of its inherent power to manage the conduct of litigation before it." Reese v. Herbert, 527 F.3d 1253, 1263 (11th Cir. 2008). "In making this determination, a court should consider whether there has been undue delay in filing, bad faith or dilatory motives, prejudice to the opposing parties, and the futility of the amendment." Saewitz, 133 F. App'x at 699 (quoting Foman, 371 U.S. at 182).

Plaintiff was allowed to amend his complaint as a matter of right, and the Court screened the amended complaint on October 24, 2016. (See doc. no. 21.) Thus, Plaintiff is not entitled to amend as a matter of right and must obtain the Court's leave to amend his complaint. Fed. R. Civ. P. 15(a)(1)(B), (2). Furthermore, although leave to amend is generally freely given, Plaintiff's amendment is improper because there has been a substantial undue delay in filing and any amendment would greatly prejudice Defendants. See Linares v. Broward Cty. Sheriff's Off., 347 F. App'x 424, 428 (11th Cir. 2009) (holding amended complaint after motion for summary judgment filed is prejudicial). Plaintiff's supplemental complaint was filed 251 days after Defendants' motion for summary judgment.

Further, to the extent Plaintiff is attempting to file the supplemental complaint and accompanying declaration in opposition to Defendants' motion for summary judgment, his filing is extremely late, and the Court does not find excusable neglect to allow the response. A Court may allow a party to file an out of time response if there was excusable neglect.

Fed. R. Civ. P. 6(b)(1)(B). The Court considers the following four factors to determine if there is excusable neglect:

> (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith.

Staley v. Owens, 367 F. App'x 102, 105 (11th Cir. 2010) (quoting Walter v. Blue Cross & Blue Shield United of Wis., 181 F.3d 1198, 1201 (11th Cir.1999)). Plaintiff had numerous chances and months to assert these new facts as evidence, and he never did. In fact, Plaintiff wrote all his responses to Defendants' motion for summary judgment after the newly alleged attack and injuries. (See doc. nos. 85, 88, 89, 92.) Any additional response arguing new information would also be prejudicial to Defendants who have already fully briefed, along with Plaintiff, their motion for summary judgment. (See doc. nos. 81, 87.) Lastly, Plaintiff gives no reason for the delay or states he was acting in good faith. The new allegations concern an attack by prison guards at an entirely different prison and are in no way related to gang violence at TSP. Thus, the Court finds no excusable neglect on the part of Plaintiff and does not consider Plaintiff's supplemental complaint as an additional response to Defendants' motion for summary judgment. In sum, Plaintiff's motion for leave to amend and add his supplemental complaint should be denied and not considered on summary judgment.

## IV.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for leave to amend and add his supplemental complaint be **DENIED**, (doc. no. 93), Defendants' motion for summary judgment be **GRANTED**, (doc. no. 81), a final

judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 6th day of February, 2019, at Augusta,

Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA